UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF  NEW YORK
_____

DON MARTIN,

                                Plaintiff

-vs-

COMMISSIONER OF SOCIAL SECURITY,

                                Defendant.

_____

            DECISION AND ORDER

            15-CV-6592 CJS

APPEARANCES

| | |
|---|---|
| For the Plaintiff: | Kevin Bambury, Esq.<br>Jeffrey Freedman Attorneys at Law<br>3445 Winton Place, Suite 214<br>Rochester, New York 14623 |
| For the Defendant: | Graham Morrison, Esq.<br>Social Security Administration<br>Office of General Counsel<br>26 Federal Plaza, Room 3904<br>New York, New York 10278 |
| | Kathryn L. Smith, A.U.S.A.<br>Office of the United States Attorney<br>for the Western District of New York<br>100 State Street<br>Rochester, New York 14614 |

INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final

determination of the Commissioner of Social Security ("Commissioner" or "Defendant"),

which denied the application of Don Martin ("Plaintiff") for Social Security Disability

Insurance Benefits ("SSDI") and Supplemental Security Income Benefits ("SSI").  Now

1

before the Court is Plaintiff's motion (Docket No. [#10]) for judgment on the pleadings and Defendant's cross-motion [#13] for judgment on the pleadings.  Plaintiff's application is denied, Defendant's application is granted, and this action is dismissed.

FACTUAL BACKGROUND

The reader is presumed to be familiar with the parties' submissions, which contain detailed recitations of the pertinent facts.  The Court has reviewed the administrative record [#9] and will reference it only as necessary to explain this Decision and Order.

Plaintiff, born in 1962, claims to be disabled primarily due to  "lumbar disc degeneration and displacement." (46, 171).[1]  Plaintiff also claims to suffer from shoulder pain and depression (211), though the medical record contains only passing references to shoulder pain,[2] and little mention of depression.[3]   At the administrative hearing in this matter, Plaintiff's counsel stated, "I think it's the limitations from his back that keep him from being able to do any work in the national economy" (46), and that is essentially how Plaintiff testified. (49-54, 56-58).

Plaintiff, who graduated from high school, has worked as a carpenter, roofer, satellite television installer and newspaper deliverer. (172, 189, 211).  Plaintiff claims that he stopped working due to pain in his back, and in particular, pain caused by

---

[1]Unless otherwise noted, citations are to the administrative record [#9].

[2]Plaintiff indicated that his shoulder hurts when he lifts objects overhead. (62).

[3]Plaintiff's counsel's pre-hearing submission listed depression as one of Plaintiff's disabling conditions (211), but Plaintiff himself did not list depression on his application for benefits.  Moreover, at the administrative hearing Plaintiff indicated that he had never had any kind of mental health therapy (51), but testified that his doctor had "just recently put [him] on Cymbalta for depression." (51).

bending over. (49-50, 52, 58). Plaintiff also claims to experience pain when standing or sitting in one position for too long. (52).

Plaintiff claims to have become disabled on December 1, 2011, though his work history was inconsistent long before that date. (30). For example, Plaintiff has *no* reported earnings for 1992, 1997-2002, 2008-2009, and 2011, and only $51.69 in reported earnings for 2010. (164-166).[4]

Plaintiff's activities of daily living essentially consist of caring for the family's home and four children[5] while his wife is working outside of the home.(47). In that regard, Plaintiff provides child care, cooks, cleans, shops, drives, and walks the family dog, in addition to chopping and carrying fire wood. (47, 54, 179-182, 229, 269-270). At least one medical note indicates that Plaintiff is an "active stay-at-home dad." (261).

A medical office note from 2006 indicates that Plaintiff was having increasing back pain and stiffness. (221). Plaintiff reportedly stated that he had been having "nagging" low back pain for about five years, with occasional exacerbation. (221). On September 20, 2006, Plaintiff reportedly stated that his back pain was "gone," and that he usually only had pain for a "couple days at a time" after "do[ing] too much." (223). On January 25, 2007, Seth Zeidman, M.D. ("Zeidman"), reported that CT testing of Plaintiff's lumbar spine showed "spondylolysis at L4-5 and L5-S1 with listhesis at L4-5." (238). Zeidman noted, however, that Plaintiff was "not significantly symptomatic," adding that, "if he becomes symptomatic he may be a candidate for posterior lumbar

---

[4]Between 1993 and 1996, Plaintiff's average annual reported earnings were $3,783.75. (164-165).

[5]*See*, record at (39) (listing four children under the age of eighteen.); *see also*, (47) (Plaintiff testified that two children are in college, while two, ages 10 and 13, are still at home).

fusion." (238).  In April 2007, Plaintiff reported having "increasing low back pain,

especially with increasing activity," related to construction work. (224).  On November

20, 2009, Plaintiff reported that his back pain tended to "flare up" "after chopping wood

or at the end of a long work day." (229).  Upon examination, Plaintiff had "no vertebral

tenderness" and "mild tenderness" in his "lower lumbar muscles bilaterally," with an

"intact" range of motion.  (229).  In February 2010, Plaintiff reported that his back pain

was more tolerable because he was only working part time as a carpenter. (230).  Upon

examination, Plaintiff was "tender across his lumbar muscles with mild tenderness in

both [sacroiliac] joints," with a normal range of motion and ambulation. (230).  In

December 2010, Plaintiff reported that his back pain was "tolerable," and that he took

"pain med[ications] and muscle relaxers three times a week." (265).  In June 2012,

Plaintiff indicated that he was taking pain medication for his back pain as needed,

"depending on [his] activity level." (256).  Plaintiff reported that he "walk[ed] dog for

exercise [and] d[id] housework," and "fe[lt] better when in the pool or hot tub." (257).

On November 30, 2012, Plaintiff reported that his back pain had worsened after

changing a flat tire. (255).  Upon examination, Plaintiff had "diffuse tenderness across

[his] lower lumbar muscles, [with] no localization [and] decreased forward flexion due to

pain." (255).

On January 22, 2013, Plaintiff was examined by Elizama Montalvo, M.D.

("Montalvo"), a non-treating consultative examiner, at the Commissioner's request.

(269-272).  Plaintiff reported that his back pain was "constant," and became worse with

prolonged walking or standing. (269). Plaintiff reportedly told Montalvo that he took

naproxen and hydrocodone twice per day for pain, and metaxaone (muscle relaxer)

"one to three times per day." (269).[6]   Plaintiff stated that he could stand "for maybe 15 to 20 minutes." (269).  Plaintiff, stated, however, that his daily activities included cleaning, doing laundry and providing childcare "seven days" a week. (269).  Plaintiff further stated that he watched television, listened to the radio and played cards. (270).  Montalvo reported that Plaintiff had full strength in all his extremities, with intact hand and finger dexterity. (271).  Montalvo found tenderness and decreased range of motion in the lower back, with a positive straight-leg-raising test. (271).  Montalvo's diagnosis was "low back pain with history of degenerative disc disease" and "arthritis . . . with pain" in the shoulder. (271).  Montalvo opined that Plaintiff would have "mild to moderate limitations bending, lifting, walking, standing, and reaching." (271).

On March 21, 2013, Zeidman examined Plaintiff, and noted that he complained of having had "a few episodes" of "increased back pain," with the last one being after he changed the flat tire. (302).  Plaintiff stated that "just about any activity" could exacerbate his pain, "especially bending and turning." (303).  Upon examination, Plaintiff appeared to be in discomfort, and walked hunched over. (304).  Zeidman ordered a CT myelogram "to better evaluate [Plaintiff's] bony pathology and spondylolisheses at L4-5 and L5-S1." (304).  Zeidman also suggested that Plaintiff try physical therapy and pain injections. (304).  Plaintiff subsequently had "facet injections" for pain. (306).

On June 6, 2013, Zeidman met with Plaintiff to review the results of the CT myelogram, at which time Plaintiff reported "a dramatic [25%] improvement" in his pain,

---

[6]This reported statement to Montalvo regarding the frequency of his use of medication is considerably different than what he told his treating medical providers. (265, 285, 287).

after attending physical therapy. (290).   However, Plaintiff still appeared to be in discomfort and walked hunched forward. (290).   Zeidman informed Plaintiff that the CT myelogram "reveale[d] stenosis at L4-5 and L5-S1 with possible stress fractures to the pars interarticularis." (291).  Zeidman indicated, however, that since Plaintiff was "experiencing minimal to no pain," that he would like to simply monitor Plaintiff's symptoms. (291).  Zeidman noted "that in the future [Plaintiff might] be a candidate for fusion at L4-5 and L5-S1." (291).

On December 6, 2013, Zeidman again examined Plaintiff, "for a routine reevaluation." (285-286).   Plaintiff reportedly stated that he had "some slight improvement" from physical therapy, and "slight" improvement from pain injections. (285).  Plaintiff claimed to have "aching throbbing pain across his lower back which radiate[d] down his legs upon standing." (285).  Plaintiff stated that he took an "occasional hydrocodone or metaxalone to help with the pain," along with using a heating pad. (285).  Plaintiff appeared to be in "some discomfort," and walked "slightly hunched." (285).  Zeidman's diagnosis was lumbar spondylosis, intervertebral lumbar disc displacement and intervertebral lumbar disc degeneration. (286).  Zeidman noted that while he had previously indicated that Plaintiff might be a candidate for fusion at L4-5 and L5-S1, Plaintiff preferred "to continue with conservative treatment," including pain injections and physical therapy. (286).

On December 6, 2013, Plaintiff reportedly told Roger Ng, M.D. ("Ng"), the pain specialist who had been providing the pain injections, that when he stood "more than 20 to 30 minutes, he [experienced] pain radiating down his right anterior thigh to his knee." (287).   Plaintiff also reportedly stated that he was taking pain medication (metaxalone

and hydrocodone/acetaminophen and naproxen) "about 2-3 days a week." (287).

## PROCEDURAL BACKGROUND

On May 14, 2014, a hearing was conducted before an Administrative Law Judge ("ALJ"). At the hearing, Plaintiff testified, *inter alia*, that he was "planning" on having back surgery (52), and that he took vicodin for pain "probably five, six days during the week." (64).[7] On June 27, 2014, the ALJ issued her Decision, finding that Plaintiff was not disabled at any time between the alleged date of onset and the date of her decision. Applying the familiar five-step sequential analysis used to evaluate social security disability claims, the ALJ found, at step one, that Plaintiff had not engaged in substantial gainful activity since the alleged onset date, December 1, 2011. (21). At step two, the ALJ found that Plaintiff had a single severe impairment -- "degenerative disc disease [of the] lumbar spine." (21). At step three, the ALJ found that Plaintiff's impairment did not meet-or-medically-equal a listed impairment. (22).

Before reaching step four of the sequential analysis, the ALJ found that Plaintiff had the residual functional capacity ("RFC") "to perform light work . . . except never climb ladders, ropes of scaffolds; occasionally stoop, kneel, crouch and crawl; avoid all exposure to unprotected heights." (22). In explaining that finding, the ALJ reviewed the medical evidence and Plaintiff's testimony, noting that Plaintiff seemed to believe (from his hearing testimony) that he qualified for benefits simply because he was unable to do his past work. (23). Regarding Plaintiff's activities of daily living, the ALJ stated: "The record clearly shows a higher level of functioning than alleged, with evidence of

---

[7]This statement, like the statement to Montalvo, is not consistent with the treatment records.

7

activities beyond all bounds of common sense about work related functioning," referring to the fact that despite Plaintiff's back condition, he walked dogs, carried fire wood and changed flat tires. (23). The ALJ also opined that Plaintiff had exaggerated at the hearing by indicating that he was a candidate for spinal fusion surgery, when the medical evidence showed that he was actually only a potential candidate, and that he and the surgeon had opted to pursue "conservative and routine" treatment measures instead of surgery. (23).

At step four of the sequential analysis, the ALJ found that Plaintiff was incapable of performing his past relevant work. (24). However, at step five of the analysis, the ALJ found, based upon testimony of a Vocational Expert ("VE"), that Plaintiff could perform other work, including the light-category jobs of "bench assembler," "nuts and bolts assembler" and "sorter." (25). Plaintiff appealed, but the Appeals Council declined to review the ALJ's determination.

On October 6, 2015, Plaintiff commenced this action. On March 17, 2016, Plaintiff filed the subject motion [#10] for judgment on the pleadings. Plaintiff's motion asserts that the ALJ erred in two ways. First, Plaintiff contends that the ALJ's RFC assessment is insufficient and requires remand, because it is "brief, contradictory, cursory and not accurate."[8] In particular, Plaintiff contends that the ALJ's statement about him not being a candidate for spinal fusion surgery was "misleading," and that the ALJ did not discuss "most" of the medical evidence, or include any "real discussion" of

---

[8]Pl. Memo of Law [#10-1] at p. 8.

the April 2013 CT scan or myelogram.[9]  Second, Plaintiff contends that the ALJ's

credibility assessment ("not entirely credible"), which he acknowledges was focused

primarily on his activities of daily living, was insufficient, because it was too brief and

focused too much on events such as Plaintiff changing the flat tire.  According to

Plaintiff, the tire-changing incident actually supported his credibility, since he was "laid

up" with pain for a few days afterward.  On May 16, 2016, Defendant filed the subject

cross-motion [#13] for judgment on the pleadings.

STANDARDS OF LAW

42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the

Commissioner of Social security as to any fact, if supported by substantial evidence,

shall be conclusive."  The issue to be determined by this Court is whether the

Commissioner's conclusions "are supported by substantial evidence in the record as a

whole or are based on an erroneous legal standard."  *Schaal v. Apfel*, 134 F.3d 496,

501 (2d Cir. 1998).  Substantial evidence is defined as "more than a mere scintilla.  It

means such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion."  *Id.*

DISCUSSION

As mentioned earlier, Plaintiff contends that this matter must be remanded to the

Commissioner because the ALJ erred in assessing credibility and in making her RFC

determination.  Notably, Plaintiff does not explain why he is unable to perform some

particular aspect of light work.  Presumably, that is because no doctor has opined that

---

[9]Plaintiff admits that the ALJ mentioned the radiological evidence. Def. Memo [#10-1] at p. 9.

Plaintiff is unable to perform the requirements of such work. Rather, he contends that the ALJ should have given a more detailed explanation.

However, the Court finds that the ALJ adequately explained her RFC finding. In that regard, "[w]hen, as here, the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability." *Christina v. Colvin*, 594 F. App'x 32, 33 (2d Cir. Feb. 19, 2015) (*quoting Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)). Here, the ALJ indicated that the RFC finding was supported by Dr. Montalvo's consultative report, which found, in pertinent part, only "mild to moderate limitations bending, lifting, walking, [and] standing." (23).

With regard to Plaintiff's contention that the ALJ should have included a lengthier discussion of the April, 2013 CT scan and myelogram, the Court disagrees. One might expect a lengthy discussion if there was some dispute as to the diagnosis. Here, however, the ALJ's decision does not dispute that Plaintiff has the underlying degenerative disk disease that is shown by the CT scan and myelogram results. However, those test results do not indicate the extent of Plaintiff's alleged limitations. Indeed, in the same report in which Zeidman discussed how the CT myelogram "reveale[d] stenosis at L4-5 and L5-S1 with possible stress fractures to the pars interarticularis," he further noted that Plaintiff was "experiencing minimal to no pain." (291).

Insofar as Plaintiff alleges that the ALJ's statements about his candidacy for "fusion surgery" were "misleading," the Court again disagrees. The ALJ accurately

noted that, according to the medical record, Plaintiff might be a candidate for such surgery in the future, but is not a candidate now, because he has elected to stick with conservative treatment. (23).

Plaintiff also contends that the ALJ overstated Plaintiff's activities of daily living, but the Court again disagrees.  The ALJ adequately explained why the evidence of Plaintiff's extensive daily activities diminished his credibility, and was inconsistent with a finding of disability.

CONCLUSION

Plaintiff's application for judgment on the pleadings [#10] is denied, and Defendant's cross-motion [#13] for judgment on the pleadings is granted.  The action is dismissed.

So Ordered.

Dated: Rochester, New York          ENTER:
          September 6, 2017


                                        /s/ Charles J. Siragusa
                                        CHARLES J. SIRAGUSA
                                        United States District Judge